**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**DON A. STEED and ELIZABETH B. STEED**                                 **PLAINTIFFS**

**vs.**                                                    **CIVIL ACTION NO. 2:05cv02146-KS-MTP**

**SANDERSON FARMS, INC.**                                              **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the court on a motion to dismiss and/or to compel arbitration, and a renewed motion to dismiss and/or to compel arbitration, by defendant Sanderson Farms, Inc. ("SFI") and Sanderson Farms, Inc. (Production Division) ("SFI PD").[1]  The court, having reviewed the motion, the various responses and replies, all matters made a part of the record of this case as well as applicable law, and being fully advised in the premises, finds that the motion is well taken and should be granted.  The court specifically finds as follows:

### FACTUAL BACKGROUND

On October 9, 2001, Elizabeth B. Steed and Don A. Steed applied to SFI (PD) to become contract broiler chicken growers.  Although the Steeds had raised cattle before, they had not been in the chicken growing business prior to this time.  SFI (PD) then began the usual grower

---

[1] SFI (PD), who is not a defendant in this action but is one of the moving parties on the instant motion along with defendant SFI, has also moved to intervene and/or to dismiss SFI and substitute itself as a defendant.  SFI (PD), a wholly-owned subsidiary of SFI, asserts that because it (not SFI) has a contractual relationship with the Steeds it should be allowed to intervene or, in the alternative, it should be substituted as the proper defendant in this action.  Plaintiffs have not opposed this motion.  The court hereby grants SFI (PD)'s motion to intervene in this action. Because of its disposition of the instant motion, the court need not reach SFI (PD)'s motion to dismiss/substitute.

1

qualification process by requesting and receiving certain background information from the Steeds and conducting a background investigation.  Mrs. Steed completed three standard forms, one of which Mr. Steed signed.

In or around January 2002, after SFI (PD) had completed its background investigation and had approved the Steeds, the Steeds met with Charles L. Bell, SFI (PD)'s Hazlehurst Production Division Manager, in the SFI (PD) Hazlehurst Production Division headquarters. Billy F. Gaddy, the SFI (PD) Broiler Manager, also attended this meeting.  The purpose of the meeting was to further discuss the Steeds' plans to become independent contract broiler growers. Because they were newcomers to this business, Mr. Bell wanted to make sure that the Steeds had a full understanding of the nature of the business and what they, and SFI (PD), should expect from each other.

At this meeting, the Steeds discussed their interest in purchasing a broiler chicken farm located at 169 Lem Sullivan Road in Simpson County, Mississippi, which was at that time owned by Michael Trinh and Thoa le Thi Kim (the "Trinh Farm", also referred to as the "Steed Farm").  Prior to this time, but in or around January 2002, the Steeds had met with Mr. Gaddy and Brian Battle, broiler supervisor, at the Trinh Farm and had inspected the chicken houses and the rest of the premises.  Mr. Steed said that he had also looked at several other broiler farms before deciding which one he wanted to own and operate.

In accordance with SFI (PD) policy, Mr. Bell discussed with the Steeds the SFI (PD) Broiler Growing Program ("BGP") and the Steeds described how they planned to operate the broiler farm.  Mr. Bell also discussed with the Steeds the highlights of the Broiler Production

2

Agreement ("BPA") which SFI (PD) uses for contract broiler growers.[2]  Mr. Bell explained that the BGP is a part of the BPA, and he told the Steeds that there was a complaint resolution process set out in the BPA which called for binding arbitration of disputes.  The Steeds did not ask any questions not express any concerns about this.  The Steeds dispute that they were told about arbitration at this meeting.

Mr. Bell also gave the Steeds an unsigned copy of the BPA form and BGP, and provided them a separate room where they could review it privately and talk about it between themselves. Mr. Bell told the Steeds that they could take as long as they wished to review the BPA and the BGP and could ask questions.  The Steeds spent approximately thirty minutes reviewing these documents and did not raise any issues nor ask any questions.

At some point thereafter, the Steeds advised SFI (PD) that they had decided to go ahead with the purchase of the Trinh Farm and become contract broiler growers for SFI (PD).  On February 6, 2002, Mr. Gaddy provided Mrs. Steed with a letter of intent confirming SFI (PD)'s intent to enter into a BPA with the Steeds.  This letter was also sent to State Bank & Trust Co., in order to facilitate the bank's lending of money to the Steeds for the purchase of the farm.  On February 28, 2002, the Steeds completed their purchase of the Trinh Farm, receiving a Warranty Deed conveying the property to them jointly.   To finance the bulk of the purchase price, the Steeds borrowed $512,000 from State Bank & Trust Co. and granted to the Bank a deed of trust to secure that indebtedness.  The Steeds were joint obligors on that deed of trust.

Mrs. Steed then signed a BPA with SFI (PD) on March 8, 2002.  According to Mrs.

---

[2] The evidence in the record demonstrates that the six-month process that led to the development of the BPA in the latter half of 1996 included substantial participation by growers and grower representatives, including many meetings, discussions and amendments.

Steed, this was the first time she had heard anything about arbitration, and at no time did anyone at SFI (PD) explain the arbitration clause to her.  Also on March 8, Mr. Trinh executed an Assignment of his BPA with SFI (PD) to Mrs. Steed in which she accepted that she was bound by its terms.  Mrs. Steed received her first batch of chickens from SFI (PD) on March 11, 2002.

The Steeds subsequently made a number of assignments of a percentage of the payments they were to receive from SFI (PD) under the BPA to State Bank & Trust Company as well as to Peoples Bank, in order to secure their bank debts and/or lines of credit.

Section 27 of the BPA contains an arbitration provision (the "Arbitration Agreement"), which states in relevant part:

> Any controversy or claim arising between the parties...,
> including, but not limited to, disputes relating to this
> Agreement, the arbitrability of any dispute relating to this
> Agreement, termination of this Agreement, or of any
> breach of this Agreement, whether such controversy or
> claim arises before, during or after termination of the
> Agreement, will be settled by binding arbitration in
> accordance with the Commercial Arbitration Rules
> of the American Arbitration Association by a panel
> of three arbitrators.

Immediately above the signature line of the BPA appears the following statements in all capital letters and bold face type: "THE UNDERSIGNED DOES HEREBY DECLARE THAT THE TERMS OF THIS AGREEMENT HAVE BEEN COMPLETELY READ AND FULLY UNDERSTOOD.  THIS AGREEMENT CONTAINS ARBITRATION LANGUAGE WHICH IS BINDING."

The Arbitration Agreement provides that the costs of arbitration are to be shared equally among the parties, and that each party shall bear their own attorneys fees and expenses.  The

Arbitration Agreement limits the allowable damages to actual money damages, specific performance and temporary injunctive relief.  The parties expressly waive their right to punitive or exemplary damages.  Section 15 of the BPA provides that for a claim by the grower relating to the BPA, Sanderson will be liable only for contract damages and other damage related directly to the breach, provided that such other damages are proven by clear and convincing evidence.  The Arbitration Agreement further provides that "upon objection by any party, multi-party arbitration shall not be utilized."  The Arbitration Agreement further provides that "either party may seek from a court any provisional remedy that may be necessary to prevent irreparable harm, pending the establishment of the arbitral panel or its determination of the merits of the controversy."  The Arbitration Agreement provides that the arbitrators shall apply Mississippi law.

On November 7, 2005, plaintiffs filed their Complaint in this action, alleging that they were fraudulently induced into the BPA by SFI (PD's) alleged misrepresentations relating to, *inter alia*, the age and condition of the chicken houses; that they were been required by SFI (PD) to make various expenditures and expensive upgrades (that would not have been necessary had the age of the chicken houses been as represented); and that after they began to complain about these  expenditures and upgrades, SFI (PD) retaliated against them by providing them with inferior chickens and feed, as well as low rankings and inadequate compensation.  Plaintiffs allege that they were ultimately unable to afford to meet SFI (PD's) demands in August 2005, and as a result SFI (PD) stopped sending flocks of chickens to their farm.  Plaintiffs allege that they are no longer able to raise poultry for income, cannot pay the deed of trust on the farm, and cannot sell the farm.  Based on these facts, plaintiffs assert claims under the Packers & Stockyards Act, 7 U.S.C. §§ 181 *et seq.*, as well as under Mississippi state law.

On November 30, 2005, SFI (PD) filed a Demand for Arbitration of the Steeds' claims with the American Arbitration Association, Case No. AAA 69 181 352 05.  In the Demand for Arbitration, SFI (PD) stated that it "expressly agrees and undertakes that it will pay all filing fees, arbitrators' fees and other administrative costs incident to such arbitration.  Sanderson Farms, Inc. (Production Division) expressly waives and releases any right that it may have to require that Elizabeth B. ("Liz") Steed or Don A. Steed pay half of the cost of such arbitration.  The provision that 'each party will bear the cost of their own expenses and attorneys' fees' is not affected hereby.[3]

Defendant and SFI (PD) then moved to dismiss and/or to compel arbitration on December 7, 2005.  Plaintiffs oppose the motion.

<u>ANALYSIS</u>

Section 4 of the Federal Arbitration Act ("FAA")[4] provides that where a party has refused to arbitrate under a written arbitration agreement, the other party may petition the court for an

---

[3] SFI (PD)  reaffirmed that offer in its rebuttal brief in support of its motion to compel.

[4] The FAA applies to all transactions "involving commerce," which means, *inter alia*, commerce between different states or between a state and a foreign country.  *See* 9 U.S.C. §§ 1, 2.  In *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 515-16 (Miss. 2005), the court held that a single agreement between a nursing home and a patient was subject to the "broad purview" of the FAA because it "evidenc[ed] in the aggregate economic activity affecting interstate commerce."  *See also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003) (single agreement executed within state between residents of same state subject to FAA because "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice...subject to federal control.'") (citations omitted).  Poultry farming is undoubtedly subject to federal control and has an aggregate effect on interstate commerce.  The court therefore finds that the FAA applies.  Moreover, the parties in this case do not dispute that the FAA applies to the Arbitration Agreement, and in the Arbitration Agreement, the parties expressly agreed that "this agreement 'involves commerce' as that term is used in the Federal Arbitration Act...".

order compelling arbitration, and the court shall order the parties to arbitration if it is satisfied that the making of the agreement is not in issue.  In resolving a motion to compel, the court must engage in a two-part inquiry: first, it must determine whether the parties agreed to arbitrate the dispute in question, by considering whether there is a valid agreement to arbitrate and whether the dispute in question falls within the scope of that arbitration agreement; and second, it must consider whether "legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Bank One, N.A. v. Coates*, 125 F.Supp. 2d 819, 827 (S.D. Miss. 2001) (*citing Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996)).  This second prong of the inquiry includes the consideration of applicable contract defenses available under state contract law which may invalidate the agreement.  *Sanderson Farms, Inc. v. Gatlin*, 848 So. 2d 828, 834 (Miss. 2003).  Indeed, section 2 of the FAA provides that a written agreement to arbitrate in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Plaintiffs make the following arguments in opposition to the motion to dismiss and/or to compel arbitration: that their claims are not covered by the Arbitration Agreement because they relate to events that occurred prior to the execution of the BPA; that the Arbitration Agreement is unenforceable because it is unconscionable; that Mr. Steed is not bound by the Arbitration Agreement because he did not sign the BPA; and that the Arbitration Agreement is unenforceable because it violates the Packers & Stockyards Act.  Each of these arguments will be addressed in turn below.

<u>Mr. Steed</u>

Plaintiffs argue that Mr. Steed cannot be bound by the Arbitration Agreement because

7

he did not sign the BPA.  However, as the Fifth Circuit has stated:  "It does not follow . . . that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. [We have made] clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."  *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004) (citation omitted) (overruling district court's finding that arbitration could not be compelled where, although husband signed arbitration agreement, wife never did).

In *Bailey*, the court based its finding on the doctrine of equitable estoppel, which precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes as well.  364 F.3d at 267.  The court noted that all of the wife's claims against defendants arose directly from loans and credit insurance her husband had obtained from defendants (none of which the wife had co-signed).  *Id.*  Thus, the wife was "suing based upon one part of a transaction that she says grants her rights while simultaneously attempting to avoid other parts of the same transaction that she views as a burden - namely, the arbitration agreement."  *Id.* at 268.  The court held that the doctrine of equitable estoppel, which "prevents a party from 'having it both ways'" would not allow the wife to take such inconsistent positions.  *Id.*   The Mississippi Supreme Court followed *Bailey* in  *Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004), holding that a wife was bound by arbitration agreement that her husband signed but that she did not sign, under principle of equitable estoppel.[5]

---

[5] The court noted that it doubted that the husband and wife were actually hoping to win this argument, since it would mean that the wife would have no standing or right to sue

Mr. Steed, along with his wife, met with SFI (PD) representatives to discuss the BPA. Mr. Steed is a co-owner of the Steed Farm, helped to operate the Steed Farm pursuant to the BPA, is a joint obligor on the Deed of Trust securing the indebtedness on the Steed Farm, and co-signed several assignments in order to secure the Steeds' bank debts and/or lines of credit. More importantly, Mr. Steed is a plaintiff in this case, and the claims he is asserting against defendant arise from the BPA and/or from his and his wife's dealings with SFI(PD). Mr. Steed is clearly trying to "have it both ways," which he is equitably estopped from doing. This court therefore finds that Mr. Steed is bound by the Arbitration Agreement.[6]   The court will now address the plaintiffs' arguments that the Arbitration Agreement does not cover their claims and that it is unenforceable.

<u>The Scope of the Arbitration Agreement</u>

There is a strong presumption in favor of arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Vicksburg Partners*, 911 So. 2d at 513-14; *Terminix*, 904 So. 2d at 1054. Accordingly, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25. *See also First Family Fin'l*

---

Terminix, and Terminix would have no contractual obligation to the wife and could therefore not be liable to her for damages. *Terminix*, 904 So. 2d at 1058 n.3. The court makes the same observation here with respect to the Steeds.

[6] Defendant and SFI (PD) also argue that there was an agency relationship between Mr. and Mrs. Steed and for that reason as well, Mr. Steed is bound by the Arbitration Agreement. The court does not need to address this argument, as it finds that under the principle of equitable estoppel, Mr. Steed is bound by the Arbitration Agreement.

*Servs., Inc. v. Fairley*, 173 F.Supp. 2d 565, 569 (S.D. Miss. 2001) (*citing Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000)).   Indeed, the Fifth Circuit has stated that arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 335 (5th Cir. 1987).

The Arbitration Agreement in the BPA covers "[a]ny controversy or claim arising between the parties..., including but not limited to, disputes relating to this Agreement, the arbitrability of any dispute relating to this Agreement, termination of this Agreement, or of any breach of this Agreement, whether such controversy or claim arises before, during or after termination of the Agreement...".   This type of language is interpreted broadly.   "The Mississippi Supreme Court has noted that broad terms defining the scope of an arbitration agreement such as 'any controversy' are 'broad sweeping' and expansive enough to include most claims related to the contract in question." *New South Fed'l Savings Bank v. Anding*, 414 F.Supp. 2d 636, 651 (S.D. Miss. 2005) (*citing Smith Barney, Inc. v. Henry*, 772 So. 2d 722, 725-26 (Miss. 2001)).   And the Fifth Circuit has held that arbitration clauses containing the language "relating to" are broad clauses that "are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil Exploration & Prod. Co. v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998), *reh'g denied en banc*, 1998 U.S. App. LEXIS 18505 (5th Cir. 1998) (citation omitted).

Plaintiffs argue that because their claims are primarily grounded in allegations of fraudulent inducement that occurred prior to the execution of the BPA, these claims cannot

be subject to the BPA.  However, the Supreme Court has held that an arbitration agreement applying to "any claim or controversy arising out of or relating to this Agreement, or the breach thereof" is broad enough to encompass a claim of fraudulent inducement into the Agreement.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967).  *See also Bloxom v. Landmark Publ'g Corp.*, 184 F.Supp. 2d 578, 584 (S.D. Tex. 2002) (holding that arbitration clause applying to claims "arising out of or in connection with" the contract was broad and covered alleged fraud and deceptive practices relating to contract formation); *Am. Heritage Life Ins. Co. v. Beasley*, 174 F.Supp. 2d 450, 455 (N.D. Miss. 2001), *aff'd*, 37 Fed. Appx. 712 (5th Cir. 2002) (holding that claim of misrepresentation in connection with loan transaction was covered by loan agreement's arbitration clause which applied to "any claim arising from or relating to...the loan agreement.").

Thus, in light of the broad language of the Arbitration Agreement, the policies favoring arbitration and the authority cited above, the court finds that the Arbitration Agreement covers all of plaintiffs' claims against SFI (PD) in this action.  It will now turn to plaintiffs' arguments that the Arbitration Agreement is unenforceable because it is unconscionable and because it violates the PSA.

Unconscionability

The doctrine of unconscionability has been defined as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party."  *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1207 (Miss. 1998).  There are two types of unconscionability that will void a contract under Mississippi law: procedural unconscionability and substantive unconscionability.  *New S.*

*Fed'l Savings Bank v. Anding*, 414 F.Supp. 2d 636, 644 (S.D. Miss. 2005) (citations

omitted).  Procedural unconscionability addresses the formation of the contract, while

substantive unconscionability focuses upon the contract's actual terms.  *Id.*  Plaintiffs argue

that both types of unconscionability are implicated in this case and therefore each will be

addressed separately below.

Procedural Unconscionability

Procedural unconscionability is proven by demonstrating "a lack of knowledge, lack

of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in

sophistication or bargaining power of the parties and/or a lack of opportunity to study the

contract and inquire about the contract terms."  *Anding*, 414 F.Supp. 2d at 644 (citation

omitted).  Plaintiffs argue that the Arbitration Agreement is procedurally unconscionable in

the following ways: it is a contract of adhesion drafted by SFI (PD) and presented on a take-

it-or-leave-it basis with no negotiation; the parties had unequal bargaining power; the Steeds

had no meaningful choice but to sign the BPA because they could not change to another

poultry company or sell their farm; they did not understand the Arbitration Agreement; they

did not have an opportunity to study the Arbitration Agreement or ask questions about it; and

there was no bold language in the Arbitration Agreement stating that they were waiving their

right to trial in a court of law.

As a threshold matter, the court notes that contracts of adhesion[7] "are not

_____

[7] The Mississippi Supreme Court defines "contracts of adhesion" as contracts that are
"drafted unilaterally by the dominant party and then presented on a 'take it or leave it' basis to
the weaker party who has no real opportunity to bargain about its terms.  Such contracts are
usually prepared in printed for, and frequently at least some of their provisions are in extremely
small print."  *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 716 (Miss. 2002), *cert. denied*, 537 U.S.

automatically void." *Hughes Training, Inc. v. Cook*, 254 F.3d 588, 594 (5th Cir. 2001), *cert. denied*, 534 U.S. 1172 (2002); *see also Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 520 (Miss. 2005); *Norwest Fin'l Mississippi, Inc. v. McDonald*, 905 So. 2d 1187, 1194 (Miss. 2005); *Anding*, 414 F.Supp. 2d at 645. Thus, as with other contracts, the party seeking to void an arbitration clause in an adhesion contract must demonstrate that it is unconscionable. *See Norwest*, 905 So. 2d at 1194-95; *Vicksburg*, 911 So. 2d at 518-520; *Anding*, 414 F.Supp. 2d at 644-51.

The Steeds argue that the parties' unequal bargaining power establishes procedural unconscionability. However, this is the very essence of adhesion contracts, which, as noted above, are not *per se* unconscionable. Indeed, cases routinely uphold arbitration clauses where the parties had unequal bargaining power. *See, e.g.*, *Norwest*, 905 So. 2d at 1193-94 (arbitration agreement between consumers and bank); *Vicksburg*, 911 So. 2d at 520 (arbitration agreement between nursing home and individual); *Anding*, 414 F.Supp. 2d at 644 (arbitration agreement between bank and individual mortgagees); *First Family Fin'l Servs., Inc. v. Sanford*, 203 F.Supp. 2d 662, 666-67 (N.D. Miss. 2002) (arbitration agreement between individual and consumer lender).

The Steeds also argue that they had no choice but to sign the BPA. However, the Steeds had a choice as to whether to become poultry growers and, specifically, whether to become SFI (PD) broiler growers. The Steeds had a choice of poultry production farms and

---

1194 (2003) (citations omitted). The court will assume for the purposes of this analysis (and SFI (PD) does not dispute) that the BPA is a contract of adhesion.

in fact approached several other than SFI (PD).[8]  *See Norwest*, 905 So. 2d at 1194-95

(borrowers failed to show lack of meaningful choice where they produced no evidence that

they could not get loans from another company or that they had tried to get a loan without

signing an arbitration agreement).  The Steeds voluntarily applied to become broiler growers

for SFI (PD).  At the January 2002 meeting with Mr. Bell and Mr. Gaddy, the Steeds were

provided with a copy of the BPA and were given the opportunity to review it privately and

ask questions.  If the Steeds had any issues with the Arbitration Agreement, they could have

chosen not to sign the BPA.  There is no evidence that the Steeds "even balked at the idea of

signing the arbitration agreement."  *Id.* at 1194.  And the Steeds do not argue that, at the time

the BPA was entered into, they were "under such 'timing or other pressures' as to have been

prevented from 'contracting with another party on more favorable terms or ... refraining from

contracting at all.'"  *First Family Fin'l Servs., Inc. v. Fairley*, 173 F.Supp. 2d 565, 570 (S.D.

Miss. 2001)(citations omitted).

As for the plaintiffs' claim that they did not understand the Arbitration Agreement

and did not have the opportunity to study it or ask questions about it, as a matter of

Mississippi law parties to a contract are under a duty to read the contract before they sign it.

*Sanford*, 203 F.Supp. 2d at 666 (citations omitted); *see also McKenzie Check Advance v.*

*Hardy*, 866 So. 2d 446, 455 (Miss. 2004) ("It is well settled under Mississippi law that a

contracting party is under a legal obligation to read a contract before signing it.").  And, at

any rate, contracting parties are bound by the contents of the contract they sign, whether they

---

[8] Indeed, Mrs. Steed stated in her Second Supplemental Affidavit that she looked at
several other poultry farms but for a variety of reasons was not interested in any of them.

read it or not.  *Hopkins v. Coldwell Real Estate Corp.*, 2006 U.S. Dist. LEXIS 58384, at * 3 (N.D. Miss. 2006); *see also Massey v. Tingle*, 867 So. 2d 235, 240 (Miss. 2004) ("[I]n Mississippi, a person is charged with knowing the contents of any document that he executes.").  In this case, plaintiffs were given an opportunity to read the BPA and to ask any questions they may have had.  Plaintiffs do not dispute that they were given a copy of the BPA at the January 2002 meeting. According to SFI (PD), the Steeds spent at least a half hour reading over the BPA.  The fact that they did not ask any questions about what they were signing does not matter.  "Failure by a party to inform himself of what he is signing does not make the agreement unconscionable or unenforceable." *Sanford*, 203 F.Supp. 2d at 666 (citation omitted).

The Arbitration Agreement is written in simple and plain English.  *Fairley*, 173 F.Supp. 2d at 570.   Although the Steeds argue that the Arbitration Agreement contains complex legalistic language that they did not understand, they do not argue that they lack a basic education or that they are unable to read.  *See Norwest*, 905 So. 2d at 1194.  The Arbitration Agreement is written in the same size and type font as the rest of the BPA, and although perhaps SFI (PD) could have used bold print directly above the Arbitration Agreement, the court does not find that this is enough to render the Agreement procedurally unconscionable.  *Cf. East Ford, Inc. v. Taylor*, 826 So. 2d 709, 716-17 (Miss. 2002) (finding arbitration provision procedurally unconscionable where it was less than one-third the size of other terms in the document, appeared in very fine print and was not in bold type while other provisions of the agreement were).  And, finally, Elizabeth Steed signed the BPA below the following statement that appears in all capital letters and bold face type: "THE

15

UNDERSIGNED DOES HEREBY DECLARE THAT THE TERMS OF THIS

AGREEMENT HAVE BEEN COMPLETELY READ AND FULLY UNDERSTOOD.

THIS AGREEMENT CONTAINS ARBITRATION LANGUAGE WHICH IS BINDING."

This also militates against a finding of unconscionability.  *See, e.g., Vicksburg*, 911 So. 2d at

520 (finding no unconscionability where above signature line was "all caps bold-faced

consent paragraph drawing special attention to the parties' voluntary consent to the

arbitration provision").

     Based on these facts, the court is unconvinced that there was any procedural

unconscionability in the Arbitration Agreement.

     <u>Substantive Unconscionability</u>

     "Substantive unconscionability may be proven by showing the terms of the arbitration

agreement to be oppressive."  *East Ford*, 826 So. 2d at 714 (citation omitted).   Plaintiffs

argue that the Arbitration Agreement is substantively unconscionable in a number of ways:

the high costs of arbitration, the limitation and waiver of certain damages and remedies; the

exemption of certain of  SFI (PD)'s remedies from arbitration, severe diminution of the

arbitrators' power, mandated payment of the parties' own attorneys fees; and mandated "clear

and convincing evidence" of consequential damages.  The court, however, finds that the

agreement is not substantively unconscionable.

     First, plaintiffs argue that the Arbitration Agreement is one-sided because the BPA

expressly permits SFI (PD) to exercise its contractual rights to terminate a grower's contract

and repossess the grower's flock without first resorting to arbitration, while plaintiffs are

required to arbitrate all their claims.[9]  However, "mutuality of obligation is not required for a contract to be enforceable" and an "arbitration clause is not unenforceable solely because it is one-sided."  *Pridgen v. Green Tree Fin'l Servicing Corp.*, 88 F.Supp. 2d 655, 659 (2000) (S.D. Miss. 2000) (citations omitted).  *See also Anding*, 414 F.Supp. 2d at 643-44, 645 (arbitration agreement requiring defendants to arbitrate all disputes while allowing bank to pursue certain actions in court not unconscionable); *Murphy v. AmSouth Bank*, 269 F.Supp. 2d 749, 752 (S.D. Miss. 2003) (rejecting plaintiffs' argument that arbitration agreement was unconscionable because it mandated arbitration of any of their claims while allowing AmSouth to use various court remedies); *Fairley*, 173 F.Supp. 2d at 572 (citation omitted) (upholding arbitration agreement requiring individual to arbitrate claims while allowing other party, a commercial lender, remedies of arbitration, repossession or foreclosure).  One-sidedness is simply one factor a court may consider in determining whether an arbitration clause is substantively unconscionable.  *Anding*, 414 F.Supp. 2d at 645 (citation omitted).  The court finds that the alleged one-sidedness of the Arbitration Agreement does not, on its own, establish unconscionability.

Plaintiffs also argue that the high costs of arbitration render the Arbitration Agreement unconscionable.  Courts "review all questions concerning unconscionability under the circumstances that existed at the time the contract was made."  *Vicksburg*, 911 So. 2d at

---

[9] SFI (PD) disputes this allegation, arguing that although SFI (PD) need not arbitrate in advance of termination, neither must the growers, and that they are both still required to arbitrate all disputes relating to termination.  However, section 22 of the BPA expressly provides that although Sanderson does not have to arbitrate prior to termination, the grower must resolve disputes, including disputes relating to termination, by arbitration.  SFI (PD) also argues that growers are given a broader right to terminate than SFI (PD), because they can terminate for any reason by giving 90 days prior notice, whereas SFI (PD) must have cause before termination.

517 (citations omitted); *see also Overstreet* v. *Contigroup*, 2006 U.S. App. LEXIS 21564, at *2 (5th Cir. 2006) (holding that unconscionability is analyzed by looking to the circumstances at the time of contract formation, rather than at a later time).   The BPA was executed on March 8, 2002, and therefore the Steeds need to demonstrate unconscionability at that time.

Plaintiffs' evidence of unconscionability based on the high costs of arbitration consists of the following: in their response to the motion to compel, plaintiffs stated: "Elizabeth B. Steed could not afford to pay these arbitration costs."   In her original affidavit, Mrs. Steed stated:  "I cannot now, nor could I ever have been, able financially to pay the costs of arbitration as required by Sanderson Farms' arbitration clause."   In a supplemental affidavit, Mrs. Steed stated: "I cannot afford to pay for arbitration" and attaches tax returns for the years 2002-2005.  In Mrs. Steed's second supplemental response, she reiterated that she is "not financially able to pay...the costs of arbitration as required by Sanderson's arbitration clause," and attached a 2001 tax return.  This evidence is simply not enough.  *See Norwest*, 905 So. 2d at 1196 (holding that affidavit stating amount of money earned per month and statement that could not afford arbitration fees not enough to meet burden of unconscionability).  There is no evidence in the record, for example, regarding the value of any assets owned by the Steeds at the time the BPA was entered into.  *See Overstreet*, 2006 U.S. App. LEXIS 21564, at *2**.**  And Mr. Steed has remained entirely silent on this issue, nowhere stating that he is unable to afford arbitration.

Moreover, the Steeds have not applied to the AAA for relief from the costs of arbitration.  The BPA incorporates the AAA's Commercial Arbitration Rules, which provide in Rule 49 that "[t]he AAA may, in the event of extreme hardship on the part of any party,

18

defer or reduce the administrative fees."  In *Anding*, the court held that because defendants did not request a deferment of fees from the AAA on the basis of financial hardship, they could not establish unconscionability.  414 F.Supp. 2d at 646.  *See also Parkerson v. Smith*, 817 So. 2d 529, 544 (Miss. 2002) (no indication that plaintiff ever made an effort to avail herself of the benefits of the AAA rule allowing deferment of fees); *Sanderson Farms, Inc. v. Gatlin*, 848 So. 2d 828, 850 (Miss. 2003) (Cobb, J., dissenting) (unconscionability determination cannot be made where no diminution or waiver of fees sought from the AAA).

The Supreme Court had held that "where...a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  *Green Tree Fin'l Corp. v. Randolph*, 531 U.S. 79, 92 (2000).  The Steeds cannot do so because they have not provided any evidence of what the costs of arbitration would be in this case.  They have provided evidence of arbitration costs incurred in other cases, but this is not sufficient to establish that they would incur substantial costs.  *See id.* at 91 n.6.  In addition, plaintiffs cannot meet this burden because SFI (PD) has offered to pay all the costs of arbitration.  *See Fairley*, 173 F.Supp. 2d at 570-71; *Sanford*, 203 F.Supp. 2d at 667; *see also Murphy v. AmSouth Bank*, 269 F.Supp. 2d 749, 752 (S.D. Miss. 2003) (objection that potential costs of arbitration render arbitration agreement unconscionable rendered moot by bank's stipulation that it will bear the cost of arbitration); *Gatlin*, 848 So. 2d at 850 (Cobb, J., dissenting) (district court should accept Sanderson's offer to pay arbitration fees).[10]

---

[10] Plaintiffs argue that this offer is an impermissible rewriting of the BPA.  However, it is well-settled that a contracting party may waive terms that are for its benefit and may waive terms requiring another party's performance.  *See, e.g.*, *Pike v. Howell Bldg. Supply, Inc.*, 748 So. 2d

In further support of their unconscionability argument, plaintiffs also attack the various limitations and waivers of remedies and damages contained in the Arbitration Agreement.  First, plaintiffs argue that the waiver of exemplary and punitive damages is unconscionable.  However, courts have upheld waivers of punitive damages in arbitration agreements.  *See*, *e.g.*, *Anding*, 414 F.Supp. 2d at 650 ( holding that prohibition of state common law punitive damages in arbitration agreement is enforceable); *Investment Partners, L.P. v. Glamour Shots Licensing, Inc.*, 298 F.3d 314, 317-18 (5th Cir. 2002) (upholding arbitration agreement with general prohibition of punitive damages).[11]  *Cf. Gatlin*, 848 So. 2d at 854 (Cobb, J., dissenting) ("I am not willing to interpret our Legislature as having established a public policy, favoring punitive damages, of such force as to negate private parties' efforts to mutually waive the opportunity to seek such damages from each other.").

In *Vicksburg Partners*, the Mississippi Supreme Court did find that an arbitration agreement was unconscionable because, *inter alia*, it waived punitive damages.[12]  911 So. 2d at 523-24.  The court there found that, in effect, such a waiver was one-sided (even though both parties were waiving) because although there were many reasons why Stephens, an

---

710, 713 (Miss. 1999); *Brent Towing Co. v. Scott Petrol Corp.*, 735 So. 2d 355, 359 (Miss. 1999); *Mariana v. D.M. Hennington*, 229 Miss. 212, 226 (Miss. 1956).

[11] These cases expressly decline to address the issue of whether statutory (state or federal) punitive or exemplary damages can be waived in an arbitration agreement.  The only statute under which the plaintiffs seek relief in their Complaint is the PSA, which does not provide for awards of punitive or exemplary damages in actions by individuals.  *See* 7 U.S.C. § 209. Therefore, this court need not reach the issue of whether federal or state statutory punitive or exemplary damages may be waived in an arbitration agreement.

[12] The court did not invalidate the entire arbitration agreement, but struck the punitive damages waiver from the agreement and upheld the remainder of the agreement.  *Vicksburg Partners*, 911 So. 2d at 524-25.

individual, might seek punitive damages against Vicksburg Partners, a nursing home, the court was "unable to develop factual scenarios which would justify Vicksburg Partners seeking punitive damages against Stephens." *Id.* at 523.   However in this case, as SFI (PD) points out, there are numerous circumstances in which it might want to seek punitive damages against a grower - for example, if the grower were willfully or maliciously damaging or neglecting its chickens.

Plaintiffs also argue that the Arbitration Agreement contains a virtual waiver of consequential damages because it requires proof of such damages by "clear and convincing evidence."   However, even if the parties had waived consequential damages entirely, this would not render the Arbitration Agreement unconscionable.  *See, e.g., Overstreet*, 2006 U.S. App. LEXIS 21564, at *6 n.2 (noting that even if Georgia law were unsettled on this issue, because all doubts are resolved in favor of arbitration, such a waiver would not be unconscionable).[13]

As for the provision that "[u]pon objection by any party, multi-party arbitration shall not be utilized," the court does not find this to be unconscionable as courts generally uphold waivers of class actions in arbitration agreements, even in the context of an adhesion contract and even where the right to proceed by class action derives from statute.  *See, e.g., Vigil v. Sears Nat'l Bank*, 205 F.Supp. 2d 566, 573 (E.D. La. 2002); *Randolph v. Green Tree Fin'l Corp.*, 244 F.3d. 814, 817-18 (11th Cir. 2001).

Plaintiffs argue that the Arbitration Agreement does not allow them to seek permanent injunctive relief.  However, the Arbitration Agreement does not mention permanent injunctive

---

[13] This court has not found anything in Mississippi law to the contrary.

relief at all, and SFI (PD) admits in its reply to plaintiffs' supplemental response to the motion to compel that "[i]t is not true that the BPA denies a grower the right in arbitration to seek permanent injunctive relief, if a showing is made consistent with Mississippi law that such relief is warranted."

Plaintiffs argue that the Arbitration Agreement's mandated payment of each party's own expenses and attorney fees is unconscionable.  However, the court disagrees, as "[a]bsent some statutory authority or contractual provision, attorneys' fees cannot be awarded under Mississippi law unless punitive damages are also proper."  *Anding*, 414 F.Supp. 2d at 651 *(citing Mississippi Power & Light Co. v. Cool*, 832 So. 2d 474, 486 (Miss. 2002)).  The waiver of punitive damages, as discussed above, is appropriate, and plaintiffs have cited no contractual or statutory authority for attorneys fees.  Therefore, this court finds that this provision is not unconscionable.  *See id.*

Finally, as for plaintiffs' contention that the Arbitration Agreement severely diminishes the power of the arbitrators, as discussed above, the court finds that  provisions of the Arbitration Agreement are appropriate and are not unconscionable, and it therefore rejects this argument.

<u>Packers and Stockyards Act</u>

As a final matter, plaintiffs argue that the unilateral drafting of the Arbitration Agreement by SFI (PD), offered to the Steeds on a "take-it-or-leave-it" basis, as well as the various provisions of the Arbitration Agreement discussed above, violates Section 202(3) of the Packers and Stockyards Act, which states in pertinent part:

It shall be unlawful for any packer with respect to livestock,

22

meats, meat food products, or livestock products in
unmanufactured form, or for any live poultry dealer with
respect to live poultry, to: (a) Engage in or use any unfair,
unjustly discriminatory, or deceptive practice or device; or
(b) Make or give any undue or unreasonable preference or
advantage to any particular person or locality in any respect
whatsoever, or subject any particular person or locality to any
undue or unreasonable prejudice or disadvantage in any
respect whatsoever."

The court has been unable to find, nor have plaintiffs cited to, any authority from this jurisdiction or others holding that an arbitration agreement violates the PSA or that the PSA constitutes some sort of exception to the FAA.  In *Wheeler v. Cagle-Keystone Foods, LLC*, 148 Fed. Appx. 760, 761 (11th Cir. 2005), the court affirmed summary judgment for defendant on a claim that offering growers a raise in exchange for signing an arbitration agreement did not violate the PSA because the agreements were offered to all growers.[14]  Here, the BPA is offered by SFI (PD) to all contract broiler growers.

As discussed above, the court has found that the Arbitration Agreement is neither procedurally nor substantively unconscionable and is therefore fully enforceable against the plaintiffs.  The court cannot discern any reason why the Arbitration Agreement is "unfair," "unjustly discriminatory" or "deceptive," nor does the court find that it results in any "undue or unreasonable preference or advantage" or "undue or unreasonable prejudice or disadvantage."  Thus, this argument fails as well.

<u>CONCLUSION</u>

---

[14]  The only other case the court was able to find dealing with an arbitration agreement in the context of a PSA claim is *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1324-25 (11th Cir. 2005), where the court held that offering growers higher rates of pay in exchange for signing an arbitration agreement did not violate the PSA.

Based on the foregoing analysis, the court finds that all of plaintiffs' claims are subject to a valid and binding arbitration agreement and that arbitration must be compelled. Moreover, because "[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration," the court finds that the instant case should be dismissed rather than stayed. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Hopkins v. Coldwell Real Estate Corp.*, 2006 U.S. Dist. LEXIS 58384, at *4 (N.D. Miss. 2006) (dismissing case without prejudice where all claims subject to arbitration agreement).[15]

IT IS THEREFORE ORDERED AND ADJUDGED that defendant's and SFI (PD)'s motion to dismiss and/or to compel arbitration [**# 3, 20**] is granted.  Plaintiffs' Amended Complaint is hereby dismissed without prejudice and the parties are directed to proceed to arbitration on plaintiffs' claims.

IT IS FURTHER ORDERED AND ADJUDGED that all other pending motions are dismissed as moot.

SO ORDERED AND ADJUDGED, this the 29th day of September, 2006.


*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE

---

[15] Indeed, dismissal, rather than a stay, is appropriate because "[a]ny post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by ... 9 U.S.C. §§ 9-12." *Alford*, 975 F.2d at 1161.